**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LAURA BEDSON, individually and on behalf of all others similarly situated, | |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| BIOSTEEL SPORTS NUTRITION INC. | |
| Defendant. | |

Plaintiff Laura Bedson ("Plaintiff") brings this Class Action Complaint against Defendants BioSteel Sports Nutrition Inc. ("Defendant" or "BioSteel"), individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

## NATURE OF THE ACTION

1.      Plaintiff brings this important consumer class action lawsuit on behalf of similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendant's BioSteel Blue Raspberry flavored Sports Drink (the "Product"), which is marketed as the "healthiest and most trusted sports hydration product[] on the planet,"[1] and is prominently labeled as "Zero Sugar" and "Eco Friendly" when, in fact, Plaintiff's testing has revealed that the Product contains per- and polyfluoralkyl substances ("PFAS"), a category of synthetic chemicals that are, by definition, not healthy for consumers or the environment.

---

[1] https://biosteel.com (Last Accessed January 24, 2023)

1

2.      PFAS are a group of synthetic, man-made, chemicals known to be harmful to both humans and the environment.  Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxicity effects, and various cancers in epidemiology studies."[2]

3.      In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health.  Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[3]

4.      Defendant formulates, manufactures, markets, and sells the Product, which they uniformly represent as being made from "clean, quality ingredients," "designed with sustainability in mind," and "good for [consumers] and the environment."[4]

5.      Defendant's marketing of the product as a healthy sports drink extends to the Products' packaging, where it cannot be missed by consumers:

---

[2] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," Environ. Sci. Technol. 2022, 56, 1162-1173, 1162.

[3] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-healthrisks-underestimated/ (last visited Aug. 15, 2022).

[4] https://biosteel.com/collections/sports-drinks/products/sports-drink-blue-raspberry-12-pack (Last Accessed January 25, 2023)









Long before anyone even knew the brand name, our original "**Pink Drink**" made its way into the most prestigious locker rooms in professional sports, popping up on TV screens and social media feeds everywhere.

Affectionately known as **#DrinkThePink™** it became highly regarded for its premium ingredients and zero sugar formula.

Our mission is to create the healthiest and most trusted sports nutrition products on the planet.

**The best kept secret in sports is no longer a secret. It's Just The Truth!**



**BIOSTEEL.COM**
**FOLLOW US @BIOSTEELSPORTS**



FIND OUT MORE

5 6 7

6.     Accordingly, reasonable consumers reasonably believe that the Product is a safe and healthy sports drink.

7.     Defendant clearly knows the importance of marketing and labeling, including the value of the label representations they carefully choose for placement on the Product. Even beyond its packaging, Defendant has engaged in extensive marketing efforts to inform consumers about the health benefits of drinking the Product, including through high profile endorsement deals with well-known professional athletes and partnerships with professional sports organizations such as the National Hockey League.

8.     Defendant's uniform representations that the Product is a "clean" sports drink with significant health benefits are purposefully designed to drive sales and increase profits, including by targeting health-conscious consumers who reasonably believe that the Product is free from chemical ingredients which are known to be harmful to human health.

9.     However, despite Defendant's consistent and pervasive marketing representations to consumers that their Product is a healthy sports drink, Plaintiff's independent testing has determined that the Product actually contains PFAS—a category of man-made chemicals with a toxic, persistent, and bioaccumulative nature which are associated with numerous health and environmental concerns.

---

[5]https://www.amazon.com/dp/B08DP4R7WX/ref=redir_mobile_desktop?_encoding=UTF8&aax itk=cbb05cac16bdedd7b898145fea180b1f&content-id=amzn1.sym.552bcbb2-81a1-4e8b-b868-3fba7d5af42a%3Aamzn1.sym.552bcbb2-81a1-4e8b-b868-3fba7d5af42a&hsa_cr_id=5294377530601&pd_rd_plhdr=t&pd_rd_r=15009445-593f-47d3-b9fe-ba703a25f7f9&pd_rd_w=bHQ47&pd_rd_wg=c4ZZ0&qid=1668628493&ref_=sbx_be_s_sparkl e_lsi4d_asin_0_title&sr=1-1-9e67e56a-6f64-441f-a281-df67fc737124 (last accessed November 17, 2022).

[6] *Id.*

[7] *Id.*

10.     The presence of PFAS is entirely inconsistent with Defendant's uniform representations that the Product is clean, eco-friendly, and good for both consumers and the environment.

11.     As a result of Defendant's misconduct, Plaintiff and putative Class Members have suffered injury in fact, including economic damages.

12.     Accordingly, Plaintiff brings his claims against Defendant individually and on behalf of a Class of all other similarly situated for (1) violation of New York Gen. Bus. Law § 349, *et seq.*; (2) violation of New York Gen. Bus. Law § 350, *et seq.*; (3) breach of express warranty; (4) fraud; (5) constructive fraud; and (6) unjust enrichment.

## PARTIES

### A.  Plaintiff

13.     Plaintiff Laura Bedson is a resident of Queens, New York, and was, at all times relevant hereto, a citizen of New York.

### B.  Defendant

14.     Defendant BioSteel Sports Nutrition Inc. is a Canadian Company with its corporate headquarters in North York, Ontario, located at 90 Wingold Ave, M6B1P5. Defendant's products in the United States are manufactured in Buffalo, New York at 2299 Kenmore Avenue, 14207. Defendant is registered in New Jersey as a foreign profit corporation, entity number 010105185, and has a registered agent in New Jersey.

## JURISDCTION AND VENUE

15.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more proposed Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest

and costs, and (iii) there is minimal diversity because a Plaintiff and Defendant are citizens of different states.

16.     This Court has personal jurisdiction over the Defendant because it transacts business in this State and District, has substantial aggregate contacts with this State and District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons in this State and District, and because they purposefully availed themselves of the laws of the State of New York.

17.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District, including Plaintiff's purchase of the Product, because Defendant transacts substantial business in this District, and because Defendant has intentionally availed themselves of the laws and markets within this District.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

18.     Defendant manufactures and sells a variety of sports drinks, sports hydration mixes, specialty nutrition products, and protein products under the BioSteel brand name.

19.     BioSteel's sports hydration drinks—including the Product at issue in this lawsuit-- are designed to provide optimal hydration through their use of electrolytes. These drinks are used by professional and amateur athletes, and consumers-at-large, who are seeking the health and performance benefits of increased hydration.

20.     In the already crowded sports drink market, there is enormous incentive for Defendant to differentiate itself from its competitors selling healthier and more environmentally friendly products.

21.     In order to capitalize on consumer demand for "cleaner" sports drinks, Defendant aggressively markets its products to health-focused consumers by positioning BioSteel as the "better for you" hydration.[8]

22.     Defendant sells its products on its own website, and at mass market retailers and grocery stores throughout the United States, including RiteAid, Vitamin Shoppe and CVS.

***Defendant's False and Deceptive Nutrition Claims***

23.     The Product is a ready-to-drink beverage that is uniformly represented as a sugar-free sports hydration drink with various health and nutritional benefits, including claims that the Product contains "essential electrolytes" including sodium, potassium, chloride, calcium, and magnesium (the "Nutrition Claims").

24.     The Product's front label informs consumer that the Product is "Zero Sugar" and "Sugar Free."[9]



---

[8] https://biosteel.com/pages/about
[9] https://biosteel.com/collections/sports-drinks/products/sports-drink-blue-raspberry-12-pack

9





25.   The Product's side panel touts its other nutritional benefits, including the fact that it contains "Essential Electrolytes."



26.     The Product's other side panel lists its ingredients, which include water, electrolytes, citric acid, natural flavors, and stevia leaf extract. Nothing about the ingredients lead the consumer to believe it contains harmful PFAS chemicals.



27.     The BioSteel website further touts the health benefits of the Product, including the fact that it is vegan, gluten free, and made from non-GMO ingredients[10]:

## DETAILS

BioSteel's premium zero sugar Sports Drink has been designed in the most natural way possible to keep you hydrated throughout the day. Our Sports Drink is made from clean, quality ingredients, and has essential electrolytes and contains. Designed with sustainability in mind, our packaging is eco-friendly and made from renewable sources, which means it's good for you and the environment.

- Zero Sugar
- Essential Electrolytes
- Vegan
- Non-GMO
- Gluten Free
- Recyclable
- Plant-Based Cap
- BPA/PET Free
- Packaging Made From Renewable Sources
- 12 x 16.7 fl oz Tetra Pak Bottles

***Defendant's Other False and Deceptive Advertising***

28.     Even beyond the Nutrition Claims described herein, Defendant makes various other representations about the Product designed to convince reasonable consumers that the Product is a safe and healthy choice for consumers and to further bolster its Nutrition Claims.

---

[10] https://biosteel.com/collections/sports-drinks/products/sports-drink-blue-raspberry-12-pack

29.     Defendant refers to the Product as "clean," a term which reasonable consumers understand to mean the Product does not contain ingredients which are known or suspected to be harmful to human health or the environment.[11]

## BIOSTEEL SPORTS DRINKS: CLEAN. HEALTHY. HYDRATION.™

BioSteel's mission is to create the healthiest and most trusted sports hydration products on the planet. Whether you're a pro-athlete, the next generation of athletes, a weekend warrior or just living your everyday life, BioSteel is the better for you hydration option. The best kept secret in sports is no longer a secret.

**IT'S JUST THE TRUTH**


ZERO SUGAR


ESSENTIAL ELECTROLYTES


GREAT TASTE

Get 15% Off!

30.     Defendant's uniform representations continue through to Defendant's official social media channels, including its verified Instagram account, which describes the brand as "Clean. Healthy. Hydration.™"

31.     In fact, Defendant has used the "Clean. Healthy. Hydration" throughout its Instagram page as a marketing campaign while partnering with high profile stars such as Dallas Mavericks Forward, Luka Doncic and Quarterback for the Kansas City Chiefs, Patrick Mahomes.[12]

---

[11] https://biosteel.com/ (Last accessed November 17, 2022).
[12] https://www.instagram.com/p/Ckylrb3vsLd/ (Last accessed November 17, 2022).



13

32.     The Defendant also endorses the Product as one for families to enjoy, featuring an image on its Instagram page of a child drinking the Product.

---

13



14

33.     The Defendant also has many promotional videos on YouTube that reinforce the "Clean. Healthy. Hydration" slogan.



15

14 https://www.instagram.com/p/CaPk1Kgu5Q7/ (Last Accessed November 17, 2022).
15

16

34.     Defendant also employs various marketing representations to convince consumers that the Product is good for the environment, including listing these benefits on the Product's packaging where they cannot be missed by consumers.



https://www.bing.com/videos/search?q=clean+healthy+hydration+biosteeel&docid=6080118188 10746090&mid=B23D6D4439EDEEFF269AB23D6D4439EDEEFF269A&view=detail&FOR M=VIRE Last Accessed November 17, 2022).

35.     The "Good for the Environment" marketing representations are also prominently featured on Defendant's official social media channels:



36.     Nowhere on the Product's packaging, or in any of its marketing representations, does Defendant disclose the presence of PFAS—or any other synthetic chemical—in the Product.

37.     Defendant's products are aggressively marketed to health-focused consumers, owing in large part to the purported health benefits of drinking a clean sports drink without harmful ingredients.

38.     These uniform representations are no coincidence; even Defendant's press releases represent its products as providing "Clean. Healthy. Hydration."[17] (emphasis in original).

---

[16] https://www.instagram.com/p/CaXPiveMkpJ/ (Last Accessed November 17, 2022).
[17] https://www.prnewswire.com/news-releases/biosteel-introduces-its-clean-healthy-hydration-sports-drinks-to-nearly-15-000-new-stores-across-the-united-states-301470970.html (Last Accessed November 17, 2022)

39.     It is undeniable that the Product is uniformly represented across all marketing channels-- including the Product's packaging, where it cannot be missed by consumers -- as a sports drink with significant health benefits that is also good for the environment.

***PFAS Chemicals and Associated Risks***

40.     PFAS are a category of highly persistent and potentially harmful <u>man-made chemicals</u>.[18]

41.     PFAS are <u>not naturally occurring</u>.[19] They were first developed by scientists in the 1940s.[20]  Thus, they are indisputably "artificial".

42.     The man-made PFAS chemicals, which are in the Product, are sometimes called "forever chemicals" because they bioaccumulate, or build up in the body over time.

43.     PFOA is well-known to negatively impact the human body and the environment, including because "PFOA persists in the environment and does not break down."[21]

44.     Further, "PFOA can remain in the body for long periods of time. In laboratory animals given large amounts, PFOA can affect growth and development, reproduction, and injure the liver."[22]

45.     Given the deleterious effects of PFOA on the body and environment, it is one of the most commonly studied[23] and commonly regulated.

46.     A November 2012 research report on "Durable Water and Soil repellent chemistry in the textile industry," explained:

---

[18] *PFAS Explained*, EPA, https://www.epa.gov/pfas/pfas-explained (last visited October 24, 2022).
[19] https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html (Last accessed October 24, 2022)
[20] https://www.3m.com/3M/en_US/pfas-stewardship-us/pfas-history/ (Last accessed October 24, 2022).
[21] https://www.cdc.gov/biomonitoring/PFOA_FactSheet.html
[22] *Id.*
[23] https://www.atsdr.cdc.gov/pfas/health-effects/overview.html

PFOA and PFOS, the most widely known and studied long-chain PFAAs, have been shown to be persistent in the environment, have long elimination half-life in wildlife and humans, and have toxicological properties of concern. Due to these properties, regulatory actions have been put in place or are being considered in several countries to manage these substances.

47.     Consequently, "[t]he recognition of these hazardous properties and global distribution has led the scientific, regulatory and industrial communities to engage in international efforts to curb the production and uses of long-chain PFASs."[24]

48.     In November 10, 2017, PFOA was added to the list of chemicals known to the state of California to cause reproductive toxicity.

49.     On March 19, 2021, the California Environmental Protection Agency's Office of Environmental Health Hazard Assessment (OEHHA) filed a notice of intent to list PFOA as a chemical known to cause cancer under Proposition 65.[25] The OEHHA determined that PFOA meets the criteria for listing as known to the state to cause cancer based on the 2020 findings of the National Toxicology Program.

50.     Diet is considered a major route of PFAS exposure for humans, and reasonable consumers purchasing Product represented as not containing "artificial flavors" would not expect them to contain harmful man-made chemicals, such as PFAS.[26]

51.     PFAS chemicals have been associated with a variety of negative health effects for humans and the environment.

---

[24] *Id.*
[25] https://oehha.ca.gov/media/downloads/crnr/p65noilabpfoacancer2021p.pdf
[26] *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*, Environmental Health Perspectives, https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092 (Last accessed October 24, 2022).

52.    The EPA has identified that "[c]urrent peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to:"[27]

    a.    Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.

    b.    Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.

    c.    Increased risk of some cancers, including prostate, kidney, and testicular cancers.

    d.    Reduced ability of the body's immune system to fight infections, including
    e.    reduced vaccine response.

    f.    Interference with the body's natural hormones.

    g.    Increased cholesterol levels and/or risk of obesity.

53.    A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[28]

---

[27] https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas

[28] *Emerging chemical risks in Europe — 'PFAS'*, EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified Mar. 9, 2021) https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.



54.     The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[29]

55.     The danger of PFAS chemicals is well known.  On September 20, 2020, a *New York Times* article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies", reported on the dangers of PFAS—particularly during gestation and in early childhood development:[30]

---

[29] *Id.*

[30] Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, NEW

56.     Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.[31]

57.     The persistence of PFAS and their potential to cause environmental harm is also well documented, and was addressed in "The Madrid Statement," issued by the Green Science Policy Institute.  In this statement, more than 250 scientists from 38 countries, recommended the following actions in order to mitigate future harm: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2) labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[32]

58.     The Environmental Protection Agency ("EPA") further advises that limiting exposure to PFAS can help protect individual health. "Because certain PFAS are known to cause risks to human health, the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[33]

59.     There is no treatment to remove PFAS from the body. Because PFAS accumulates in body tissues over time, the most obvious way to avoid exposure is for consumers to avoid products which they know contain PFAS.[34]

---

YORK TIMES (Sept. 23, 2020, updated Oct. 18, 2021) https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.

[31] https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html

[32] *The Madrid Statement*, GREEN SCIENCE POLICY INSTITUTE, https://greensciencepolicy.org/our-work/science-policy/madrid-statement/ (Last accessed October 12, 2022)

[33] https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk (Last accessed October 24, 2022).

[34] https://www.healthline.com/health-news/how-to-reduce-your-exposure-to-pfas-the-hidden-toxic-forever-chemicals#How-to-limit-PFAS-exposure (Last accessed October 24, 2022).

60.     Defendant is well aware of consumers' desire to avoid potentially harmful chemicals, which is exactly why it has engaged in an aggressive, uniform marketing campaign intended to convince consumers that the Product is "clean," and therefore free from potentially harmful ingredients like PFAS.

61.     Defendant has engaged in this uniform marketing campaign in an effort to convince reasonable consumers to believe that the Product is superior to other products that are not "clean" or do not have the same purported health benefits.

62.     Reasonable consumers purchasing the Product would believe, based on Defendant's representations, that the Product does not contain artificial, synthetic or man-made chemicals that could adversely impact their health.

***Plaintiff's Independent Testing Confirms the Presence of PFAS Chemicals in the Product***

63.     Plaintiff sought independent third-party testing to determine whether the Product contained PFAS chemicals.

64.     Plaintiff's independent testing was conducted in accordance with accepted industry standards for detecting the presence of PFAS.

65.     Plaintiff's testing detected material levels of PFAS in the Product, including significant levels of 1H, 1H, 2H, 2H-perfluorooctane sulfonic acid ("6:2FTS"), Perfluoro-n-decanoic acid ("PFDA"), Perfluoro-n-decanoic acid ("PFHpA"), Perfluoro-n-nonanoic acid ("PFNA"), Perfluoro-n-octanoic acid ("PFOA), and Perfluoro-n-undecanoic acid ("PFUdA").

66.     Thus, Defendant's Product exposes hundreds of thousands of unsuspecting consumers to toxic synthetic chemicals in direct contradiction to their uniform label claims.

67.     While the EPA has not yet established guidance for the presence of 6:2FTS, PFDA, PFHpA, PFNA, and PFUdA in drinking water, it recently confirmed that the levels at which

negative health effects could occur are from exposure to certain PFAS chemicals is much lower than previously understood– including <u>near zero</u> in some cases.[35]

68.     The EPA recently tightened its lifetime health advisory levels for PFOA exposure in drinking water. For PFOA, the recommendation is 0.004 part per trillion (ppt).[36]

69.     The amount of PFOA found within the Product from Plaintiff's testing exceeds the amount of PFOA permitted in water by the EPA.

***Defendant's Unlawful Conduct***

70.     At all times relevant to this action, Defendant knew, or at minimum should have known, that its Product contains PFAS.

71.     To capitalize on increasing consumer demand for  "clean" and environmentally safe products that are free from harmful man-made chemicals like PFAS, Defendant has knowingly and willfully deployed a concerted strategy to distinguish its Product from competing options in the highly competitive sports drink industry by representing the Product using the Nutrition Claims and other misrepresentations and omissions as described herein.

72.     Throughout the class period, Defendant has targeted health-conscious consumers by falsely and misleadingly representing its Product as a healthy, safe, "clean" sports beverage free from harmful artificial ingredients and added sugar.  Consequently, reasonable consumers believe the Product is free of artificial, man-made chemicals known to harm human health.

73.     Defendant is well-aware that consumers are increasingly demanding beverage options that support their wellness goals. In their own words, "BioSteel is seeing its story come full circle from its authentic hockey roots as the brand continues to cement itself as the go-to sports

---

[35] *Id*.
[36] *Id*.

drink for those seeking a cleaner, healthier hydration option."[37]

74.     Defendant's wellness-focused business strategy is supported by current market research. According to a recent survey, chemicals in food (including carcinogens or cancer-causing chemicals) represents the most important food safety issue to consumers.[38] Consumers ranked this concern more highly than any other concern, including foodborne illness from bacteria and use of pesticides.[39]

75.     At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices. One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[40]

76.     These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[41]

77.     Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[42]

---

[37] https://www.nhl.com/news/biosteel-named-official-hydration-partner-of-nhl-nhlpa/c-334812110 (Last Accessed November 17, 2022).
[38] Tom Neltner, "Chemicals in food continue to be a top food safety concern among consumers," (Sept. 16, 2021), https://blogs.edf.org/health/2021/09/16/chemicals-in-food-continue-to-be-a-topfood-safety-concern-among-consumers/ (last visited Aug. 12, 2021).
[39] *Id.*
[40] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wpconent/uploads/2017/07/What-Shoppers-Want.pdf (last visited Aug. 12, 2022).
[41] Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors," https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-thegame-for-food-beverage-processors/ (last visited Aug. 12, 2022).
[42] Made Safe, "What Shoppers Want," at 3.

78. Therefore, current research demonstrates, and Defendant's marketing strategy supports, that the presence of harmful chemicals in food, beverages, and their packaging is material to reasonable consumers.

79. Defendant's strategy to stay aligned with consumer preferences in order to retain a competitive advantage in the marketplace, which includes representing to sell "clean" beverages which do not contain ingredients which are suspected to cause harm to human health and the environment, would inevitably be negatively impacted if it disclosed the presence of PFAS in its Product.

80. Further, Defendant's claims touting its Product as the "healthiest" and "most trusted" sports hydration product on the planet, further contribute to the reasonable consumer perception and belief that the Product contains only ingredients that are good for humans and the environment, and that it is free of man-made chemicals indisputably linked to negative health effects.

81. Consumers lack the expertise to ascertain the true ingredients in the Product prior to purchase. Accordingly, reasonable consumers must, and do rely on Defendant to accurately and honestly advertise its Product's ingredients and health benefits. Further, consumers rely on Defendant to not contradict those representations by using artificial man-made chemicals in its Product that are known to pose a risk to human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

82. Defendant's representations that the Product is healthy for humans and the environment, including *inter alia*, the representations described herein, are false because products containing toxic, man-made ingredients like PFAS are neither good for consumers nor the environment.

27

83. Defendant's representations are likely to mislead reasonable consumers, and indeed did mislead Plaintiff and Class members, regarding the presence of PFAS chemicals in its Product. Accordingly, these acts and practices by Defendant are deceptive.

84. Consumers reasonably relied on Defendant's false statements and misleading representations, and reasonably expected that Defendant's Product would conform with its representations and, as such, would not contain artificial, man-made PFAS chemicals.

85. Defendant's false statements, misleading representations and material omissions are intentional, or otherwise entirely careless, and render its Product worthless or less valuable.

86. If Defendant had disclosed to Plaintiff and putative Class Members that its Product contained PFAS chemicals, Plaintiff and putative Class Members would not have purchased Defendant's Product or they would have paid less for them.

87. Plaintiff and Class Members were among the intended recipients of Defendant's deceptive representations and omissions described herein.

88. Defendant's representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

89. The materiality of the representations described herein also establishes causation between Defendant's conduct and the injuries Plaintiff and the Class Members sustained.

90. Defendant is aware that the consumers are concerned about the use of PFAS in its products, yet it has continued to market and advertise its Product using the health-focused Nutrition Claims and other representations described herein in order to profit off of unsuspecting consumers, including Plaintiff and Class Members.

91.     The presence of PFAS chemicals in Defendant's Product is entirely inconsistent with its uniform representations.

92.     Defendant's knowingly false and misleading representations have the intended result of convincing reasonable consumers that its Product is "clean" and therefore does not contain artificial, man-made, toxic chemicals. No reasonable consumer would consider Defendant's Product as clean, or good for people and the environment, if they knew that the Product contained harmful, artificial PFAS chemicals.

93.     Defendant's false, misleading, and deceptive representations, as described herein, are likely to continue to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiff and Class Members.

94.     In making the false, misleading, and deceptive representations, Defendant knew and intended consumers would pay a premium for the Product over comparable products that are made from or contain synthetic or artificial ingredients.

95.     Plaintiff and Class Members all paid money for the Product, however, they did not obtain the full value of the advertised Product due to Defendant's misrepresentations as detailed herein. Plaintiff and Class Members purchased, purchased more of, or paid more for, the Product than they would have had they known the truth about the Product's artificial, man-made, and harmful ingredients. Thus, Plaintiff and Class Members have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

96.     Defendant's widespread marketing campaign portraying the Product as containing healthy ingredients as detailed herein, is misleading and deceptive to consumers because the Product is made with artificial, man-made, and toxic ingredients. Plaintiff brings this action on behalf of the proposed Classes to stop Defendant's misleading practices.

## PLAINTIFF'S FACTUAL ALLEGATIONS

97.     Plaintiff Laura Bedson is a citizen and resident of the state of New York.  During the applicable statute of limitations period, Plaintiff purchased and consumed Defendant's Product that contained PFAS.  More specifically, during the class period Plaintiff purchased Defendant's Product numerous times online from amazon.com while living in Queens, New York.

98.     Prior to her purchase, Plaintiff reviewed the labeling, packaging, and marketing materials of her Product, including those set out herein, including the Nutrition Claims and other representations set out herein. Thus, Plaintiff understood that based on Defendant's claims, the Product was safe for use and was free of harmful, man-made chemicals like PFAS. Plaintiff reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that she would not have purchased the Product, or would not have purchased it on the same terms, if the true facts had been known.

99.     As a direct result of Defendant's material misrepresentations and omissions, Plaintiff suffered and continues to suffer, economic injuries.

100.    Plaintiff continues to desire to purchase the Product from Defendant if she can rely on that Product to be safe and free from any artificial ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendant's misrepresentations detailed herein, Plaintiff is unable to determine if Defendant's Product is actually free of harmful chemicals like PFAS in the future.  Plaintiff understands that the composition of the Product may change over time, but as long as Defendant may freely advertise the Product as safe or healthy when it actually contains material levels of PFAS, then when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate

the different prices between Defendant's Product and competitor's products, which do in fact contain only clean and healthy ingredients and are free of PFAS.

## INJURY TO THE PUBLIC AT-LARGE AND POTENTIAL FOR FUTURE HARM

101. Defendant's wrongful conduct harms the public-at-large.

102. PFAS chemicals, also known as "forever chemicals," are a category of highly persistent and toxic man-made chemicals that have been associated with numerous negative health effects for humans.

103. PFAS chemicals are known to negatively impact the human body, including, but not limited to, decreased fertility, developmental effects or delays in children, increased risk of cancers, liver damage, increased risk of asthma and thyroid disease, adverse impacts on the immune system, interference with hormones and increased cholesterol levels.

104. PFAS chemicals are further known to negatively impact the environment,

105. Because Defendant's deceptive advertising is ongoing and directed to the public, and because Defendant continues to sell its Product containing PFAS chemicals, the deception poses an ongoing risk to the public.

106. As such, a public injunction must be provided in order to enjoin Defendant's continued harm of consumers and the public-at-large.

## TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

107. Defendant had actual knowledge, or should have had actual knowledge, that its Product contained artificial, man-made PFAS chemicals which pose a risk of harm to human health.

108. Although Defendant was aware of the deception in their advertising, marketing, packaging, and sale of the Product given the inclusion of PFAS chemicals, it took no steps to disclose to Plaintiff or Class Members that its Product contained PFAS chemicals.

109.   Despite its knowledge, Defendant has fraudulently misrepresented the Product as having qualities and characteristics it does not, while concealing the fact that its Product contains PFAS chemicals.

110.   Defendant has made, and continues to make, affirmative false statements and misrepresentations to consumers, and continues to omit the fact that the Product contains PFAS, to promote sales of its Product.

111.   Defendant has misrepresented, concealed, and otherwise omitted material facts that would have been important to Plaintiff and Class Members in deciding whether to purchase the Product. Defendant's misrepresentations and omissions were knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members. Accordingly, Plaintiff and Class Members reasonably relied upon Defendant's misrepresentations and concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

112.   The PFAS chemicals in the design and/or manufacture of Defendant's Product was not reasonably detectible to Plaintiff and Class Members.

113.   At all times, Defendant actively and intentionally misrepresented the qualities and characteristics of the Product, while concealing the existence of the PFAS chemicals and failing to inform Plaintiff or Class Members of the existence of the PFAS chemicals in its Product. Accordingly, Plaintiff's and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

114.   Defendant's statements, words, and acts were made for the purpose of deceiving the public, and suppressing the truth that the Product contained artificial, man-made PFAS chemicals.

115.    Defendant misrepresented the Product and concealed the PFAS chemicals for the purpose of delaying Plaintiff and Class Members from filing a complaint on their causes of action.

116.    As a result of Defendant's intentional misrepresentations and active concealment of the PFAS chemicals and/or failure to inform Plaintiff and Class Members of the PFAS chemicals, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendant is estopped from relying on any statutes of limitations in light of its intentional misrepresentations and active concealment of the inclusion of artificial, man-made PFAS chemicals in the Product.

117.    Further, the causes of action alleged herein did not occur until Plaintiff and Class Members discovered that the Product contained PFAS chemicals. Plaintiff and Class Members had no realistic ability to discern that the Product contained PFAS chemicals until they learned of the existence of the PFAS chemicals. In either event, Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence and true nature of the Product.

## FEDERAL RULE OF CIVIL POROCEDURE 9(b) ALLEGATIONS

118.    Although Defendant is in the best position to know what content it placed on its packaging, website(s), and other marketing and advertising during the relevant timeframe, and the knowledge that it had regarding the PFAS chemicals and its failure to disclose the existence of PFAS chemicals in the Product to Plaintiff and consumers, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

119.    **WHO**: Defendant made its Nutrition claims and other health and environmentally-focused representations on the Product's packaging, online, and its marketing and advertising of the Product.

120.   **WHAT**: Defendant's conduct here was, and continues to be, deceptive and fraudulent because of its Nutrition claims and other health and environmentally-focused representations . Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Product was manufactured and sold with the represented qualities. Defendant knew or should have known this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet it continued to pervasively market the Product as possessing qualities they do not have.

121.   **WHEN**: Defendant made material misrepresentations, false statements and/or material omissions during the putative Class periods and at the time Plaintiff and Class Members purchased the Product, prior to and at the time Plaintiff and Class Members made claims after realizing the Product contained artificial, man-made chemicals, and continuously throughout the applicable Class periods.

122.   **WHERE**: Defendant's marketing message was uniform and pervasive, carried through false statements, misrepresentations, and/or omissions on the Product's packaging, as well as on website(s) and social media channels used to market and advertise the Product.

123.   **HOW**: Defendant made false statements, misrepresentations and/or material omissions regarding the presence of PFAS chemicals in the Product.

124.   **WHY**: Defendant made the false statements, misrepresentations and/or material omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Product over other brands that did not make similar Nutrition Claims and other health and environment-focused representations, the effect of which was that Defendant profited by selling the Product to many thousands of consumers.

125.     **INJURY**: Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Product when they otherwise would not have, absent Defendant's misrepresentations, false and misleading statements.

## CLASS ACTION ALLEGATIONS

126.     Plaintiff brings this action individually and as the representative of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the below-defined Classes:

> **National Class**: During the fullest period allowed by law, all persons who purchased the Product within the United States for personal use and not for resale.

> **New York Subclass**: During the fullest period allowed by law, all persons who purchased the Product within the State of New York for personal use and not for resale.

127.     Members of the classes described are referred to herein as "Class Members" or members of the "Class."

128.     Plaintiff reserves the right to amend the Class definitions or add a Class or Classes if discovery and/or further investigation reveal that the Class definition(s) should be narrowed, expanded or otherwise modified.

129.     The following are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been

finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

130.    **Numerosity – Federal Rule of Civil Procedure 23(a)(a)**: While Plaintiff does not know at this time the exact number of proposed Class Members, given the nature of the claims and the volume of sales of the Product nationally, the members of the Class are so numerous that their individual joinder herein is impracticable.  Plaintiff is informed and believes that there are tens of thousands of members in the proposed Class, if not more, and a precise number can be ascertained through discovery. The number of individuals who comprise the Class are so numerous that the disposition of all such person's claims in a class action, rather than in individual actions, will benefit both the parties and the courts.

131.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**: Common questions of law and fact exist as to all members of each of the Class and predominate over questions affecting only individual members of the Class. Such common questions of law or fact include, but are not limited to, the following:

a.      Whether Defendant misrepresented, omitted, and/or failed to disclose material facts concerning the Product;

b.      Whether Defendant's conduct was unlawful; unfair; fraudulent and/or deceptive;

c.      Whether Defendant breached express warranties to Plaintiff and Class Members;

d.      Whether Defendant was unjustly enriched as a result of the unlawful conduct alleged herein such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the proposed Class;

e.      Whether Plaintiff and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

Defendant engaged in a common course of conduct giving rise to the legal rights Plaintiff seeks to enforce on behalf of himself and the other Members of the proposed Class. Similar or

identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action.

132. **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiff's claims are typical of the claims of the other Members of the Class because, among other things, all Members of the Class were comparably injured through Defendant's uniform misconduct described herein. Further, there are no defenses available to Defendant that are unique to Plaintiff or to any particular Members of the Class.

133. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other Members of the Class he seeks to represent; he has retained counsel competent and experienced in complex class action litigation; and he will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and the undersigned counsel.

134. **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, Members of the Class would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

135.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Members of the Class to individually seek redress for Defendant's wrongful conduct.  Even if Members of the Class could afford individual litigation, the court system could not.  Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**Violation of the New York Deceptive Trade Practices Act,**
**New York Gen. Bus. Law § 349, *et seq.***
**(Plaintiff on behalf of the New York Subclass)**

136.     Plaintiff repeats and re-alleges the allegations above as if set forth herein.

137.     The New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

138.     Defendant misleadingly, inaccurately, and deceptively advertises and markets their Product to consumers.

139.     Defendant's improper consumer-oriented conduct—including labeling and advertising the Product using the Nutrition Claims and other health and environmental-focused

representations as described herein —is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass Members to purchase and pay a premium for Defendant's Product and to use the Product when they otherwise would not have. The Defendant has made the untrue and/or misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth.

140.   Plaintiff and the New York Subclass Members have been injured inasmuch as they paid a premium for a Product that was—contrary to Defendant's representations— not free of artificial ingredients and did contain dangerous levels of the man-made chemical PFAS. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

141.   Defendant's advertising and Product's packaging and labeling induced Plaintiff and the New York Subclass Members to buy Defendant's Product and to pay a premium price.

142.   Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Subclass Members have been damaged thereby.

143.   As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and the New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

144.   In addition, Plaintiff and Class Members seek equitable and injunctive relief against Defendant on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

145.   Finally, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT II
### Violation of the New York Deceptive Trade Practice Act,
### New York Gen. Bus. Law § 350, *et seq.*
### (Plaintiff on behalf of the New York Subclass)

146.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

147.    The N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

148.    N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

149.    Defendant's labeling and advertisements contain untrue and materially misleading statements and omissions concerning Defendant's Product inasmuch as they misrepresent that the Product is a healthy, clean, and environmentally friendly sports drink that is good for consumers.

150.    Plaintiff and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Product which were—contrary to Defendant's representations—and did contain dangerous levels of PFAS. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

151.    Defendant's advertising, packaging, and Product's labeling induced Plaintiff and the New York Subclass Members to buy Defendant's Product.

152.    Defendant made the untrue and/or misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth.

153.    Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

154.    Defendant made the material misrepresentations described in this Complaint in Defendant's advertising and on the Product's packaging and labeling.

155.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Product were and continue to be exposed to Defendant's material misrepresentations.

156.    As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

157.    In addition, Plaintiff and Class Members seek equitable and injunctive relief against Defendant on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

158.    Finally, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT III
**Fraud**
**(Plaintiff On Behalf of the Class)**

159.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

160.    At the time Plaintiff and Class Members purchased the Product, Defendant did not disclose, but instead concealed and misrepresented, the Product as safe.

161. Defendant affirmatively misrepresented the nature and quality of the Product, giving the Product the appearance of being safe for human consumption.

162. Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

163. Defendant possessed superior knowledge as Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Product.

164. Plaintiff and Class Members were reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

165. Plaintiff and Class Members had a right to reply upon Defendant's representations (and corresponding omissions) as Defendant maintained exclusive control over knowledge of the true quality of the Product.

166. Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

167. Additionally, as a result of Defendant's willful and malicious conduct, punitive damages are warranted.

## COUNT IV
### Constructive Fraud
### (Plaintiff On Behalf of the Class)

168. Plaintiff repeats and re-alleges the allegations above as if set forth herein.

169. At the time Plaintiff and Class Members purchased the Product, Defendant falsely represented the product using the Nutrition Claims and other health and environmental-focused

claims as described herein, and did not disclose that the Product contains dangerous levels of PFAS.

170. Defendant affirmatively misrepresented the nature of the Product, giving the Product the appearance of being healthy, and otherwise safe for human consumption as detailed herein.

171. Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon its representations (and corresponding omissions) in making purchasing decisions.

172. Defendant had an obligation not to omit or misrepresent the Product because in addition to the fact that the Product pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Product; (c) Plaintiff and the Class Members relied upon Defendant to make full disclosures based upon the relationship between Plaintiff and Class Members, who relied on Defendant's representations and omissions, and were reasonable in doing so, with the full knowledge of Defendant that it did and would have been reasonable in doing so.

173. Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature and quality of the Product.

174. Plaintiff and Class Members were reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

175. 152. Plaintiff and Class Members had a right to rely upon Defendant's representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendant maintained exclusive control over knowledge of the true quality of the Product, and what information was available regarding the Product.

176.    Defendant breached their duty to Plaintiff and Class Members to make full disclosures of the safety of their Product.

177.    Plaintiff and Class Members sustained actual losses and damages as a result of their reliance on Defendant's omissions and misrepresentations, and Defendant's breach of its duty, in a sum to be determined at trial.

**COUNT V**
**Unjust Enrichment**
**(In the Alternative and on Behalf of the Class)**

178.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

179.    At all relevant times, Defendant was responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Product and its packaging. At all relevant times, it was reasonably foreseeable by Defendant that the use of the Product in its intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiff and the Class as the ultimate users of the Product.

180.    At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Product posed to Plaintiff and Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

181.    Defendant as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Product, had a duty to warn Plaintiff and the Class of all dangers associated with consumption of the Product.

182.    At minimum, the duty arose for Defendant to warn consumers that use of the Product could result in injury and was unreasonably dangerous.

183.    Defendant has been unjustly enriched in retaining the revenues derived from the purchases of the Product by Plaintiff and the other members of the Class.  Retention of those monies under these circumstances is unjust and inequitable because Defendant's representations regarding the quality or value of the Product were misleading to consumers, which caused injuries to Plaintiff and the other members of the Class, because they would have not purchased the Product had they known the truth or would only have purchased the Product for a lower price.

184.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and the other members of the Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and the other members of the Class for its unjust enrichment, as ordered by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated members of the Class, prays for relief and judgment, including entry of an order, as follows:

(a) Declaring that this action is properly maintained as a class action, certifying the proposed Class, appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

(b) Directing that Defendant bear the costs of any notice sent to the Class;

(c) Ordering Defendant to pay restitution to Plaintiff and the Class;

(d) A jury trial and damages according to proof;

(e) Awarding actual damages to Plaintiff and the Class;

(f) Awarding Plaintiff and members of the Class statutory damages, as provided by the applicable state consumer protection statutes invoked above;

(g) Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class;

(h) Civil penalties, prejudgment interest and punitive damages as permitted by law; and

(i) Ordering such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial of the claims asserted in this Class Action Complaint.

Dated: January 27, 2023                          Respectfully submitted,


/s/ Jason P. Sultzer
Jason P. Sultzer, Esq.
Daniel Markowitz, Esq.
**THE SULTZER LAW GROUP P.C.**
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

Nick Suciu III*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
nsuciu@milberg.com

Gary Klinger*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
221 West Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com

Erin Ruben*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
eruben@milberg.com

J. Hunter Bryson*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Tel: (630) 796-0903
hbryson@milberg.com

* *Pro Hac Vice* application forthcoming

*Attorneys for Plaintiff and the Proposed*
*Class*