## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAURA BEDSON, individually and on behalf of all others similarly situated, | Civil Action No. 1:23-cv-00620-HG |
| Plaintiff, | |
| v. | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| BIOSTEEL SPORTS NUTRITION INC. | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Laura Bedson ("Plaintiff") brings this First Amended Class Action Complaint against Defendant BioSteel Sports Nutrition Inc. ("Defendant" or "BioSteel"), individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

## NATURE OF THE ACTION

1.      Plaintiff brings this important consumer class action lawsuit on behalf of similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendant's BioSteel Blue Raspberry flavored Sports Drink, BioSteel Rainbow Twist Flavored Sports Drink, BioSteel Mango Flavored Sports Drink, BioSteel Mixed Berry Flavored Sports Drink, and BioSteel White Freeze Flavored Sports Drink (collectively the "Products"), which are marketed as the "healthiest and most trusted sports hydration product[] on the planet,"[1] and are prominently labeled as "Zero Sugar" and "Eco Friendly" when, in fact, Plaintiff's testing has

---

[1] https://biosteel.com (Last Accessed January 24, 2023)

revealed that the Products contain per- and polyfluoralkyl substances ("PFAS"), a category of synthetic chemicals that are, by definition, not healthy for consumers or the environment.

2.      PFAS are a group of synthetic, man-made, chemicals known to be harmful to both humans and the environment.  Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxicity effects, and various cancers in epidemiology studies."[2]

3.      In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health.  Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[3]

4.      Defendant formulates, manufactures, markets, and sells the Products, which they uniformly represent as being made from "clean, quality ingredients," "designed with sustainability in mind," and "good for [consumers] and the environment."[4]

5.      Defendant's marketing of the product as a healthy sports drink extends to the Products' packaging, where it cannot be missed by consumers:

---

[2] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," Environ. Sci. Technol. 2022, 56, 1162-1173, 1162.

[3] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-healthrisks-underestimated/ (last visited Aug. 15, 2022).

[4] https://biosteel.com/collections/sports-drinks/products/sports-drink-blue-raspberry-12-pack (Last Accessed January 25, 2023)



5

[5]https://www.amazon.com/dp/B08DP4R7WX/ref=redir_mobile_desktop?_encoding=UTF8&aaxitk=cbb05cac16bde
dd7b898145fea180b1f&content-id=amzn1.sym.552bcbb2-81a1-4e8b-b868-
3fba7d5af42a%3Aamzn1.sym.552bcbb2-81a1-4e8b-b868-
3fba7d5af42a&hsa_cr_id=5294377530601&pd_rd_plhdr=t&pd_rd_r=15009445-593f-47d3-b9fe-
ba703a25f7f9&pd_rd_w=bHQ47&pd_rd_wg=c4ZZ0&qid=1668628493&ref_=sbx_be_s_sparkle_lsi4d_asin_0_title
&sr=1-1-9e67e56a-6f64-441f-a281-df67fc737124 (last accessed November 17, 2022).

3



6

---





Long before anyone even knew the brand name, our original "**Pink Drink**" made its way into the most prestigious locker rooms in professional sports, popping up on TV screens and social media feeds everywhere.

Affectionately known as **#DrinkThePink™**, it became highly regarded for its premium ingredients and zero sugar formula.

Our mission is to create the healthiest and most trusted sports nutrition products on the planet.

**The best kept secret in sports is no longer a secret. It's Just The Truth!**



**BIOSTEEL.COM**
**FOLLOW US @BIOSTEELSPORTS**



FIND OUT MORE

[7]

---

[7] *Id.*

6.      Accordingly, reasonable consumers reasonably believe that the Products are a safe and healthy sports drink.

7.      Defendant clearly knows the importance of marketing and labeling, including the value of the label representations they carefully choose for placement on the Products. Even beyond its packaging, Defendant has engaged in extensive marketing efforts to inform consumers about the health benefits of drinking the Products, including through high profile endorsement deals with well-known professional athletes and partnerships with professional sports organizations such as the National Hockey League.

8.      Defendant's uniform representations that the Products are a "clean" sports drink with significant health benefits are purposefully designed to drive sales and increase profits, including by targeting health-conscious consumers who reasonably believe that the Products are free from chemical ingredients which are known to be harmful to human health.

9.      However, despite Defendant's consistent and pervasive marketing representations to consumers that their Products are a healthy sports drink, Plaintiff's independent testing has determined that the Products actually contain PFAS—a category of man-made chemicals with a toxic, persistent, and bioaccumulative nature which are associated with numerous health and environmental concerns.

10.     The presence of PFAS is entirely inconsistent with Defendant's uniform representations that the Products are clean, eco-friendly, and good for both consumers and the environment.

11.     As a result of Defendant's misconduct, Plaintiff and putative Class Members have suffered injury in fact, including economic damages.

12.     Accordingly, Plaintiff brings his claims against Defendant individually and on behalf of a Class of all other similarly situated for (1) violation of New York Gen. Bus. Law § 349, *et seq.*; (2) violation of New York Gen. Bus. Law § 350, *et seq.*; (3) breach of express warranty; (4) fraud; (5) constructive fraud; and (6) unjust enrichment.

**PARTIES**

**A. Plaintiff**

13.     Plaintiff Laura Bedson is a resident of Queens, New York, and was, at all times relevant hereto, a citizen of New York.

**B. Defendant**

14.     Defendant BioSteel Sports Nutrition Inc. is a Canadian Company with its corporate headquarters in North York, Ontario, located at 90 Wingold Ave, M6B1P5. Defendant's products in the United States are manufactured in Buffalo, New York at 2299 Kenmore Avenue, 14207. Defendant is registered in New Jersey as a foreign profit corporation, entity number 010105185, and has a registered agent in New Jersey.

**JURISDCTION AND VENUE**

15.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more proposed Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (iii) there is minimal diversity because a Plaintiff and Defendant are citizens of different states.

16.     This Court has personal jurisdiction over the Defendant because it transacts business in this State and District, has substantial aggregate contacts with this State and District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended

effect of causing injury to persons in this State and District, and because they purposefully availed themselves of the laws of the State of New York.

17.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District, including Plaintiff's purchase of the Product, because Defendant transacts substantial business in this District, and because Defendant has intentionally availed themselves of the laws and markets within this District.

## FACTUAL ALLEGATIONS

***Defendant's Business***

18.     Defendant manufactures and sells a variety of sports drinks, sports hydration mixes, specialty nutrition products, and protein products under the BioSteel brand name.

19.     BioSteel's sports hydration drinks—including the Products at issue in this lawsuit-- are designed to provide optimal hydration through their use of electrolytes. These drinks are used by professional and amateur athletes, and consumers-at-large, who are seeking the health and performance benefits of increased hydration.

20.     In the already crowded sports drink market, there is enormous incentive for Defendant to differentiate itself from its competitors selling healthier and more environmentally friendly products.

21.     In order to capitalize on consumer demand for "cleaner" sports drinks, Defendant aggressively markets its products to health-focused consumers by positioning BioSteel as the "better for you" hydration.[8]

---

[8] https://biosteel.com/pages/about

22.     Defendant sells its products on its own website, and at mass market retailers and grocery stores throughout the United States, including RiteAid, Vitamin Shoppe and CVS.

***Defendant's False and Deceptive Nutrition Claims***

23.     The Products are ready-to-drink beverages that are uniformly represented as sugar-free sports hydration drinks with various health and nutritional benefits, including claims that the Products contain "essential electrolytes" including sodium, potassium, chloride, calcium, and magnesium (the "Nutrition Claims").

24.     The Products' front label informs consumer that the Products are "Zero Sugar" and "Sugar Free."[9]



---

[9] https://biosteel.com/collections/sports-drinks/products/sports-drink-blue-raspberry-12-pack





25.     The Products' side panel touts its other nutritional benefits, including the fact that it contains "Essential Electrolytes."



26.     The Products' other side panel lists its ingredients, which include water, electrolytes, citric acid, natural flavors, and stevia leaf extract. Nothing about the ingredients lead the consumer to believe it contains harmful PFAS chemicals.



27.     The BioSteel website further touts the health benefits of the Products, including the fact that it is vegan, gluten free, and made from non-GMO ingredients[10]:

## DETAILS

BioSteel's premium zero sugar Sports Drink has been designed in the most natural way possible to keep you hydrated throughout the day. Our Sports Drink is made from clean, quality ingredients, and has essential electrolytes and contains. Designed with sustainability in mind, our packaging is eco-friendly and made from renewable sources, which means it's good for you and the environment.

- Zero Sugar
- Essential Electrolytes
- Vegan
- Non-GMO
- Gluten Free
- Recyclable
- Plant-Based Cap
- BPA/PET Free
- Packaging Made From Renewable Sources
- 12 x 16.7 fl oz Tetra Pak Bottles

***Defendant's Other False and Deceptive Advertising***

28.     Even beyond the Nutrition Claims described herein, Defendant makes various other representations about the Products that are designed to convince reasonable consumers that the Products are a safe and healthy choice for consumers and to further bolster its Nutrition Claims.

---

[10] https://biosteel.com/collections/sports-drinks/products/sports-drink-blue-raspberry-12-pack

29.     Defendant refers to the Products as "clean," a term which reasonable consumers understand to mean the Products do not contain ingredients which are known or suspected to be harmful to human health or the environment.[11]

**BIOSTEEL SPORTS DRINKS: CLEAN. HEALTHY. HYDRATION.™**

BioSteel's mission is to create the healthiest and most trusted sports hydration products on the planet. Whether you're a pro-athlete, the next generation of athletes, a weekend warrior or just living your everyday life, BioSteel is the better for you hydration option. The best kept secret in sports is no longer a secret.

Get 15% Off!

IT'S JUST THE TRUTH



ZERO SUGAR



ESSENTIAL ELECTROLYTES



GREAT TASTE

Defendant's uniform representations continue through to Defendant's official social media channels, including its verified Instagram account, which describes the brand as "Clean. Healthy. Hydration.™"

In fact, Defendant has used the "Clean. Healthy. Hydration" throughout its Instagram page as a marketing campaign while partnering with high profile stars such as Dallas Mavericks Forward, Luka Doncic and Quarterback for the Kansas City Chiefs, Patrick Mahomes.[12]

---

[11] https://biosteel.com/ (Last accessed November 17, 2022).
[12] https://www.instagram.com/p/Ckylrb3vsLd/ (Last accessed November 17, 2022).



[13]

30.     The Defendant also endorses the Products as ones for families to enjoy, featuring an image on its Instagram page of a child drinking one of the Products.

---

[13] https://www.instagram.com/p/CZdK7ApFRaI/ (Last Accessed November 17, 2022).



14

31.    The Defendant also has many promotional videos on YouTube that reinforce the "Clean. Healthy. Hydration" slogan.



15

---

[14] https://www.instagram.com/p/CaPk1Kgu5Q7/ (Last Accessed November 17, 2022).

[15] https://www.bing.com/videos/search?q=clean+healthy+hydration+bioisteeel&docid=608011818810746090&mid=B

32.     Defendant also employs various marketing representations to convince consumers that the Products are good for the environment, including listing these benefits on the Products' packaging where they cannot be missed by consumers.



23D6D4439EDEEFF269AB23D6D4439EDEEFF269A&view=detail&FORM=VIRE Last Accessed November 17, 2022).

33.    The "Good for the Environment" marketing representations are also prominently featured on Defendant's official social media channels:



34.    Nowhere on the Products' packaging, or in any of its marketing representations, does Defendant disclose the presence of PFAS—or any other synthetic chemical—in the Products.

35.    Defendant's products are aggressively marketed to health-focused consumers, owing in large part to the purported health benefits of drinking a clean sports drink without harmful ingredients.

36.    These uniform representations are no coincidence; even Defendant's press releases represent its products as providing "Clean. Healthy. Hydration."[17] (emphasis in original).

---

[16] https://www.instagram.com/p/CaXPiveMkpJ/ (Last Accessed November 17, 2022).
[17] https://www.prnewswire.com/news-releases/biosteel-introduces-its-clean-healthy-hydration-sports-drinks-to-nearly-15-000-new-stores-across-the-united-states-301470970.html (Last Accessed November 17, 2022)

37.     It is undeniable that the Products are uniformly represented across all marketing channels-- including the Products' packaging, where it cannot be missed by consumers -- as a sports drink with significant health benefits that is also good for the environment.

***PFAS Chemicals and Associated Risks***

PFAS are a category of highly persistent and potentially harmful <u>man-made chemicals</u>.[18]

38.     PFAS are <u>not naturally occurring</u>.[19] They were first developed by scientists in the 1940s.[20]  Thus, they are indisputably "artificial".

39.     These man-made PFAS chemicals, are sometimes called "forever chemicals" because they bioaccumulate, or build up in the body over time.

40.     PFAS are frequently categorized as "long-chain" or "short-chain" depending on the number of carbon atoms present. While both long and short-chain PFAS are persistent in human bodies and the environment, long-chain PFAS have been conclusively linked to negative health consequences.[21]  Long-chain varieties of PFAS include, among others, perfluorooctanesulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA").[22]

41.     PFOS and PFOA are the most widely studied types of PFAS, with numerous studies showing a wide range of negative health effects in humans related to exposure. These health concerns were the impetus for a 2006 voluntary agreement between the Environmental Protection Agency ("EPA") and eight major chemical manufacturers to phase out their production in the United States.[23]

---

[18] *PFAS Explained*, EPA, https://www.epa.gov/pfas/pfas-explained (last visited October 24, 2022).
[19] https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html (Last accessed October 24, 2022)
[20] https://www.3m.com/3M/en_US/pfas-stewardship-us/pfas-history/ (Last accessed October 24, 2022).
[21] https://www.waste360.com/pfas-pfoas/pfas-carbon-chain-length-it-just-number-or-it (Last Accessed March 15, 2023)
[22] *Id*.
[23] https://www.theguardian.com/us-news/2019/may/23/pfas-everyday-products-toxics-guide (Last Accessed March 15, 2023)

42.    PFOA is well-known to negatively impact the human body and the environment, including because "PFOA persists in the environment and does not break down."[24]

43.    Further, "PFOA can remain in the body for long periods of time. In laboratory animals given large amounts, PFOA can affect growth and development, reproduction, and injure the liver."[25]

44.    Given the deleterious effects of PFOA on the body and environment, it is one of the most commonly studied[26] and commonly regulated.

45.    A November 2012 research report on "Durable Water and Soil repellent chemistry in the textile industry," explained:

> PFOA and PFOS, the most widely known and studied long-chain PFAAs, have been shown to be persistent in the environment, have long elimination half-life in wildlife and humans, and have toxicological properties of concern. Due to these properties, regulatory actions have been put in place or are being considered in several countries to manage these substances.

46.    Consequently, "[t]he recognition of these hazardous properties and global distribution has led the scientific, regulatory and industrial communities to engage in international efforts to curb the production and uses of long-chain PFASs."[27]

47.    In November 10, 2017, PFOA was added to the list of chemicals known to the state of California to cause reproductive toxicity.

48.    On March 19, 2021, the California Environmental Protection Agency's Office of Environmental Health Hazard Assessment (OEHHA) filed a notice of intent to list PFOA as a chemical known to cause cancer under Proposition 65.[28] The OEHHA determined that PFOA

---

[24] https://www.cdc.gov/biomonitoring/PFOA_FactSheet.html
[25] Id.
[26] https://www.atsdr.cdc.gov/pfas/health-effects/overview.html
[27] Id.
[28] https://oehha.ca.gov/media/downloads/crnr/p65noilabpfoacancer2021p.pdf

meets the criteria for listing as known to the state to cause cancer based on the 2020 findings of the National Toxicology Program.

49.     Diet is considered a major route of PFAS exposure for humans, and reasonable consumers purchasing the Products represented as not containing "artificial flavors" would not expect them to contain harmful man-made chemicals, such as PFAS.[29]

50.     PFAS chemicals have been associated with a variety of negative health effects for humans and the environment.

51.     The EPA has identified that "[c]urrent peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to:" [30]

   a.  Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.

   b.  Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.

   c.  Increased risk of some cancers, including prostate, kidney, and testicular cancers.

   d.  Reduced ability of the body's immune system to fight infections, including
   e.  reduced vaccine response.

   f.  Interference with the body's natural hormones.

   g.  Increased cholesterol levels and/or risk of obesity.

52.     A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[31]

---

[29] *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*, Environmental Health Perspectives, https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092 (Last accessed October 24, 2022).
[30] https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas
[31] *Emerging chemical risks in Europe — 'PFAS'*, EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified Mar. 9, 2021) https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.



53.     The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[32]

54.     The dangers of PFAS chemicals are well known.  On September 20, 2020, a *New York Times* article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies", reported on the dangers of PFAS—particularly during gestation and in early childhood development:[33]

---

[32] *Id.*
[33] Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, NEW YORK TIMES (Sept.

55.     Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.[34]

56.     The persistence of PFAS and their potential to cause environmental harm is also well documented, and was addressed in "The Madrid Statement," issued by the Green Science Policy Institute.  In this statement, more than 250 scientists from 38 countries, recommended the following actions in order to mitigate future harm: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2) labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[35]

57.     The Environmental Protection Agency ("EPA") further advises that limiting exposure to PFAS can help protect individual health. "Because certain PFAS are known to cause risks to human health, the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[36]

58.     There is no treatment to remove PFAS from the body. Because PFAS accumulates in body tissues over time, the most obvious way to avoid exposure is for consumers to avoid products which they know contain PFAS.[37]

---

23, 2020, updated Oct. 18, 2021) https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.

[34] https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html

[35] *The Madrid Statement*, GREEN SCIENCE POLICY INSTITUTE, https://greensciencepolicy.org/our-work/science-policy/madrid-statement/
(Last accessed October 12, 2022)

[36] https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk (Last accessed October 24, 2022).

[37] https://www.healthline.com/health-news/how-to-reduce-your-exposure-to-pfas-the-hidden-toxic-forever-chemicals#How-to-limit-PFAS-exposure (Last accessed October 24, 2022).

59.    Certain technologies have been found to remove PFAS from drinking water, especially PFOA and PFOS. These technologies include activated carbon adsorption, ion exchange resins, and high pressure membranes.[38] These technologies can be used in drinking water treatment facilities, in water systems in hospitals or individual buildings, or even in homes at the point-of-entry or point-of-use.

60.    Defendant is well aware of consumers' desire to avoid potentially harmful chemicals, which is exactly why it has engaged in an aggressive, uniform marketing campaign intended to convince consumers that the Products are "clean," and therefore free from potentially harmful ingredients and made with "filtered water," which reasonable consumers expect will filter out any potentially harmful contaminants.

61.    Defendant has engaged in this uniform marketing campaign in an effort to convince reasonable consumers to believe that the Products are superior to other products that are not "clean" or do not have the same purported health benefits.

62.    Reasonable consumers purchasing the Products would believe, based on Defendant's representations, that the Products do not contain artificial, synthetic or man-made chemicals that could adversely impact their health.

***Plaintiff's Independent Testing Confirms the Presence of PFAS Chemicals in the Products***

63.    Plaintiff sought independent third-party testing to determine whether the Products contained PFAS chemicals.

64.    Plaintiff's independent testing was conducted in accordance with accepted industry standards for detecting the presence of PFAS and tested each one of the Products, including the flavor purchased by Plaintiff. The testing was completed on January 31, 2023.

---

[38] https://www.epa.gov/sciencematters/reducing-pfas-drinking-water-treatment-technologies (Last Accessed March 15, 2023).

65.     Plaintiff's testing detected material levels of PFAS chemicals in the Products, including significant levels of including concerning levels of Perfluorooctanoic acid ("PFOA"), a long-chain PFAS that has been linked to serious health problems such as cancer[39], 1H, 1H, 2H, 2H-perfluorooctane sulfonic acid ("6:2FTS"), Perfluoro-n-decanoic acid ("PFDA"), Perfluoro-n-decanoic acid ("PFHpA"), Perfluoro-n-nonanoic acid ("PFNA"), Perfluoro-n-undecanoic acid ("PFUdA"), Perfluoro-n-dodecanoic acid ("PFDoA), Perfluoro-n-hexanoic acid (PFHxA), Perfluoro-n-pentanoic acid (PFPeA), Perfluoro-n-tetradecanoic acid (PFTeDA), Perfluorooctanesulfonic acid (PFOS), and Perfluoro-1-butanesulfonic acid (PFBS).

### _Ingestion of Any Amount PFOA and PFOS Creates Significant Health Risks_

66.     Thus, Defendant's Products expose hundreds of thousands of unsuspecting consumers to toxic synthetic chemicals in direct contradiction to their uniform label claims.

67.     While the EPA has not yet established guidance for the presence of 6:2FTS, PFDA, PFHpA, PFNA, PFUdA, PFDoA, PFHxA, PFPeA, PFTeDA, and PFBS in drinking water, it recently confirmed that the levels at which negative health effects could occur are from exposure to certain PFAS chemicals is much lower than previously understood– including near zero in some cases.[40]

68.     Human epidemiology studies have found associations between PFOA exposure and effects on the immune system, the cardiovascular system, human development (e.g., decreased birth weight), and cancer. The most sensitive non-cancer effect and the basis for the updated health advisories for PFOA is suppression of vaccine response in children.[41]

---

[39] https://www.cancer.org/healthy/cancer-causes/chemicals/teflon-and-perfluorooctanoic-acid-pfoa.html (Last Accessed March 15, 2023)
[40] _Id_.
[41] https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs#q3 (Last Accessed November 18, 2022)

69.     The EPA recently confirmed that the levels at which negative health effects could occur are much lower than previously understood– including **near zero** in some cases.[42]

70.     In other words, there is no "safe" level of exposure with regard to these chemicals, and even "trace" levels of PFAS can pose a risk to humans.

71.     Based on new data from human studies, which demonstrate the danger of extremely low levels of exposure, the EPA recently tightened its lifetime health advisory levels for exposure to certain PFAS in drinking water. For PFOA, the recommendation is 0.004 part per trillion (ppt).[43]

72.     Furthermore, on March 14, 2023, the EPA announced that due to its new understanding that almost no level of exposure to PFOA is sufficient to avoid substantial health risks, the government intends to set enforceable limits that will require near-zero levels of PFOA in the nation's drinking water.[44]

73.     Plaintiff's testing has revealed the Product contains PFOA in amounts **more than 200 times** the EPA's current recommended levels of exposure.

74.     Thus, Defendant's Product exposes hundreds of thousands of unsuspecting consumers, the majority of whom are children, to toxic synthetic chemicals at levels far beyond what the EPA deems safe.

75.     In view of the serious health risks associated with exposure to PFAS and PFOA, the quantity of PFAS in the Product is significant and cannot reasonably be considered de minimis.

---

[42] *Id.*
[43] *Id.*
[44] https://www.nytimes.com/2023/03/14/climate/epa-water-pfas-chemicals.html

*Defendant's Unlawful Conduct*

76.     At all times relevant to this action, Defendant knew, or at minimum should have known, that its Products contain PFAS.

77.     To capitalize on increasing consumer demand for  "clean" and environmentally safe products that are free from harmful man-made chemicals like PFAS, Defendant has knowingly and willfully deployed a concerted strategy to distinguish its Products from competing options in the highly competitive sports drink industry by representing the Products using the Nutrition Claims and other misrepresentations and omissions as described herein.

78.     Throughout the class period, Defendant has targeted health-conscious consumers by falsely and misleadingly representing its Products as a healthy, safe, "clean" sports beverage free from harmful artificial ingredients and added sugar.  Consequently, reasonable consumers believe the Products are free of artificial, man-made chemicals known to harm human health.

79.     Defendant is well-aware that consumers are increasingly demanding beverage options that support their wellness goals. In their own words, "BioSteel is seeing its story come full circle from its authentic hockey roots as the brand continues to cement itself as the go-to sports drink for those seeking a cleaner, healthier hydration option."[45]

80.     Defendant's wellness-focused business strategy is supported by current market research. According to a recent survey, chemicals in food (including carcinogens or cancer-causing chemicals) represents the most important food safety issue to consumers.[46]  Consumers ranked this concern more highly than any other concern, including foodborne illness from bacteria

---

[45]https://www.nhl.com/news/biosteel-named-official-hydration-partner-of-nhl-nhlpa/c-334812110 (Last Accessed November 17, 2022).
[46] Tom Neltner, "Chemicals in food continue to be a top food safety concern among consumers," (Sept. 16, 2021), https://blogs.edf.org/health/2021/09/16/chemicals-in-food-continue-to-be-a-topfood-safety-concern-among-consumers/ (last visited Aug. 12, 2021).

and use of pesticides.[47]

81.    At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices.  One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[48]

82.    These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[49]

83.    Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[50]

84.    Therefore, current research demonstrates, and Defendant's marketing strategy supports, that the presence of harmful chemicals in food, beverages, and their packaging is material to reasonable consumers.

85.    Defendant's strategy to stay aligned with consumer preferences in order to retain a competitive advantage in the marketplace, which includes representing to sell "clean" beverages which do not contain ingredients which are suspected to cause harm to human health and the environment, would inevitably be negatively impacted if it disclosed the presence of PFAS in its Products.

---

[47] *Id.*
[48] Made Safe, "What Shoppers Want: Safe & Healthy Products,"
https://www.madesafe.org/wpconent/uploads/2017/07/What-Shoppers-Want.pdf (last visited Aug. 12, 2022).
[49] Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors,"
https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-thegame-for-food-beverage-processors/ (last visited Aug. 12, 2022).
[50] Made Safe, "What Shoppers Want," at 3.

86.     Further, Defendant's claims touting its Products as the "healthiest" and "most trusted" sports hydration product on the planet, further contribute to the reasonable consumer perception and belief that the Products contain only ingredients that are good for humans and the environment, and that it is free of man-made chemicals indisputably linked to negative health effects.

87.     Consumers lack the expertise to ascertain the true ingredients in the Products prior to purchase. Accordingly, reasonable consumers must, and do rely on Defendant to accurately and honestly advertise its Products' ingredients and health benefits. Further, consumers rely on Defendant to not contradict those representations by using artificial man-made chemicals in its Products that are known to pose a risk to human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

88.     Defendant's representations that the Products are healthy for humans and the environment, including *inter alia*, the representations described herein, are false because products containing toxic, man-made ingredients like PFAS are neither good for consumers nor the environment.

89.     Defendant's representations are likely to mislead reasonable consumers, and indeed did mislead Plaintiff and Class members, regarding the presence of PFAS chemicals in its Products. Accordingly, these acts and practices by Defendant are deceptive.

90.     Consumers reasonably relied on Defendant's false statements and misleading representations, and reasonably expected that Defendant's Products would conform with its representations and, as such, would not contain artificial, man-made PFAS chemicals.

Plaintiff and putative Class Members had no reasonable means of discovering the presence of PFAS in the Product prior to their purchase.

91.     Defendant's false statements, misleading representations and material omissions are intentional, or otherwise entirely careless, and render its Products worthless or less valuable.

92.     If Defendant had disclosed to Plaintiff and putative Class Members that its Products contained PFAS chemicals, Plaintiff and putative Class Members would not have purchased Defendant's Products or they would have paid less for them.

93.     Plaintiff and Class Members were among the intended recipients of Defendant's deceptive representations and omissions described herein.

94.     Defendant's representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

95.     The materiality of the representations described herein also establishes causation between Defendant's conduct and the injuries Plaintiff and the Class Members sustained.

96.     Defendant is aware that the consumers are concerned about the use of PFAS in its products, yet it has continued to market and advertise its Products using the health-focused Nutrition Claims and other representations described herein in order to profit off of unsuspecting consumers, including Plaintiff and Class Members.

97.     The presence of PFAS chemicals in Defendant's Products is entirely inconsistent with its uniform representations.

98.     Defendant's knowingly false and misleading representations have the intended result of convincing reasonable consumers that its Products are "clean" and therefore do not contain artificial, man-made, toxic chemicals. No reasonable consumer would consider Defendant's Products as clean, or good for people and the environment, if they knew that the Products contained harmful, artificial PFAS chemicals.

99. Defendant's false, misleading, and deceptive representations, as described herein, are likely to continue to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiff and Class Members.

100. In making the false, misleading, and deceptive representations, Defendant knew and intended consumers would pay a premium for the Products over comparable products that are made from or contain synthetic or artificial ingredients.

101. Plaintiff and Class Members all paid money for the Products; however, they did not obtain the full value of the advertised Products due to Defendant's misrepresentations as detailed herein. Plaintiff and Class Members purchased, purchased more of, or paid more for, the Products than they would have had they known the truth about the Products' artificial, man-made, and harmful ingredients. Thus, Plaintiff and Class Members have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

102. Defendant's widespread marketing campaign portraying the Products as containing healthy ingredients as detailed herein, is misleading and deceptive to consumers because the Products are made with artificial, man-made, and toxic ingredients. Plaintiff brings this action on behalf of the proposed Classes to stop Defendant's misleading practices.

### PFAS Renders the Products Adulterated, Misbranded and Illegal to Sell

103. The Products are used as a drink for humans and are therefore a "food" which is regulated by the U.S. Food and Drug Administration. *See* 21 U.S.C. § 321(f).

104. The Federal Food, Drug & Cosmetic Act ("FDCA") establishes numerous regulations regarding the safety of food which is sold to consumers, including by creating various labeling requirements.

105.    Under the FDCA, a food is deemed "adulterated" if it "bears or contains any poisonous or deleterious substance which may render it injurious to health." *See* 21 U.S.C. § 342(a)(1). Even in the event that a poisonous or deleterious substance is not an "added" substance (such as in the case of unintended contamination), food is still deemed adulterated if the quantity of the substance renders it injurious to health. *Id*.

106.    As detailed herein, PFAS, and specifically the PFOA and PFOS found in Defendant's Products, are indisputably linked to negative health consequences and is therefore a "poisonous or deleterious substance."

107.    Furthermore, PFOA and PFOS were discovered in Defendant's Products at levels that are more than 200 times the EPA's recommended limit for drinking water, which supports a finding that even if the PFOA and PFOS are present due to contamination, it is still present in the Product at levels that are injurious to health.

108.    The FDA has not established any tolerances for PFAS in food. *See* 21 U.S.C. § 346.

109.    The FDCA does permit the limited use of PFAS in food contact applications, such as its use as a resin in forming gaskets, o-rings, and other parts of food processing equipment. This is due, in part, to the minimal risk of PFAS migrating from food processing equipment into the food itself.[51] However, as a result of studies which questioned the safety of long-chain PFAS such as PFOA and PFOS, the FDA worked with manufacturers beginning in the early 2000s to discontinue the use of long-chain PFAS chemicals in food contact applications.[52] In 2016, the FDA revoked regulations authorizing the remaining use of PFOA in food contact applications.

---

[51] https://www.fda.gov/food/process-contaminants-food/authorized-uses-pfas-food-contact-applications (Last visited March 14, 2023)
[52] *Id*.

As of November 2016, long-chain PFAS like PFOA are no longer used in food contact applications sold in the United States.[53]

110.    Accordingly, *there is no use of PFOA or PFOS that is currently permitted by the FDA*.

111.    Thus, regardless of the source of PFAS in the Products, it is nevertheless "adulterated" by virtue of the significant levels of toxic PFOA and PFOS present.

112.    Under the FDCA, a food is deemed "misbranded" if "its labeling is false or misleading in any particular." *See* 21 U.S.C. § 343(a).

113.    The Products iare misbranded because its labeling is false and misleading insofar as they purport to be, *inter alia*, "Eco Friendly" and "Good for You and the Environment," yet do not disclose the presence of PFAS.

114.    Food that is deemed "adulterated" or "misbranded" may not be manufactured, distributed or sold in the United States. *See* 21 U.S.C. § 331. Adulterated and misbranded products thus have no economic value and are legally worthless.

115.    In New York, the New York Agriculture and Markets Law also adopts federal labeling requirements. It defines food as "adulterated" if it bears or contains any poisonous or deleterious substance which may render it injurious to health. *See* N.Y. Agri. & Mkts. § 200. It defines food as "misbranded" if its labeling is false or misleading in any particular. *See* N.Y. Agri. & Mkts. § 201.

116.    The mere presence of PFOA and PFOS in the Products render them adulterated and misbranded.

---

[53] *Id.*

33

117.    As alleged herein, Defendant has violated the FDCA, the New York General Business Law ("GBL"), and consumer protection statutes. Defendant engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from its misrepresentations and omissions surrounding PFAS contamination affecting the Products.

118.    If Defendant had disclosed to Plaintiff and putative Class Members that the Products contained or risked containing PFAS and thus risked users to PFAS exposure, Plaintiff and putative Class Members would not have purchased the Products or they would have paid less for the Products.

119.    As a seller of a food product, Defendant had and has a duty to ensure that its Products did not and do not contain excessive (or any) level of toxic contaminants such as PFAS, including through regular testing, especially before the Products are injected into the stream of commerce for consumers to consume.

120.    But based on Plaintiff's independent testing results set forth above, Defendant made no reasonable effort to test its Products for PFAS, despite representing to the public that it maintained comprehensive safety and quality control measures. Nor did it disclose to Plaintiff in any advertising or marketing that its Products contained PFAS, let alone at levels that are many multiples of the lifetime advisory limit set by the EPA. To the contrary, Defendant represented and warranted, expressly and impliedly, that the Product was " "Eco Friendly", "Good for [consumers] and the Environment," was of merchantable quality, complied with federal and state law, and did not contain dangerous substances such as PFAS.

*The Products Are Substantially Similar*

121.   The Products are substantially similar, in that they all have the same "Zero Sugar", "Eco Friendly", and "good for [consumers] and the environment" representations on the product label.

122.   All of the representations by Defendant on the Products were uniform and mentioned nothing about the material amounts of PFAS within the Products.

123.   All of Defendant's marketing representations on the Products' are to make it seem as though it is a healthy sports drink and good for the environment, where they cannot be missed by consumers such as Plaintiff and proposed Class Members and Subclass members.

124.   All of the representations across all of the Products' labels are false for the same reason: the Products contain PFAS, a synthetic ingredient that renders the Product as not "Eco Friendly," or "good for [consumers] and the environment."

125.   Plaintiff relied upon the same representations at issue on the BioSteel Blue Raspberry flavored Sports Drink Product that are present across all of the Products.

## PLAINTIFF'S FACTUAL ALLEGATIONS

126.   Plaintiff Laura Bedson is a citizen and resident of the state of New York.  On January 8, 2023, Plaintiff purchased and consumed Defendant's BioSteel Blue Raspberry flavored Sports Drink Product that contained PFAS.  More specifically, during the class period Plaintiff purchased Defendant's Product numerous times online from amazon.com while living in Queens, New York.

127.   Prior to her purchase, Plaintiff reviewed the labeling, packaging, and marketing materials of her Product, including those set out herein, including the Nutrition Claims and other representations set out herein. Thus, Plaintiff understood that based on Defendant's claims, the

Product was safe for use and was free of harmful, man-made chemicals like PFAS. Plaintiff reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that she would not have purchased the Product, or would not have purchased it on the same terms, if the true facts had been known.

128.    As a direct result of Defendant's material misrepresentations and omissions, Plaintiff suffered and continues to suffer, economic injuries.

129.    Plaintiff continues to desire to purchase the Products from Defendant if she can rely on that Products to be safe and free from any artificial ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendant's misrepresentations detailed herein, Plaintiff is unable to determine if Defendant's Products are actually free of harmful chemicals like PFAS in the future.  Plaintiff understands that the composition of the Products may change over time, but as long as Defendant may freely advertise the Products as safe or healthy when they actually contains material levels of PFAS, then when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and competitor's products, which do in fact contain only clean and healthy ingredients and are free of PFAS.

## INJURY TO THE PUBLIC AT-LARGE AND POTENTIAL FOR FUTURE HARM

130.    Defendant's wrongful conduct harms the public-at-large.

131.    PFAS chemicals, also known as "forever chemicals," are a category of highly persistent and toxic man-made chemicals that have been associated with numerous negative health effects for humans.

132.    PFAS chemicals are known to negatively impact the human body, including, but not limited to, decreased fertility, developmental effects or delays in children, increased risk of

cancers, liver damage, increased risk of asthma and thyroid disease, adverse impacts on the immune system, interference with hormones and increased cholesterol levels.

133.    PFAS chemicals are further known to negatively impact the environment,

134.    Because Defendant's deceptive advertising is ongoing and directed to the public, and because Defendant continues to sell its Products containing PFAS chemicals, the deception poses an ongoing risk to the public.

## TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

135.    Defendant had actual knowledge, or should have had actual knowledge, that its Products contained artificial, man-made PFAS chemicals which pose a risk of harm to human health.

136.    Although Defendant was aware of the deception in their advertising, marketing, packaging, and sale of the Products given the inclusion of PFAS chemicals, it took no steps to disclose to Plaintiff or Class Members that its Products contained PFAS chemicals.

137.    Despite its knowledge, Defendant has fraudulently misrepresented the Products as having qualities and characteristics it does not, while concealing the fact that its Products contain PFAS chemicals.

138.    Defendant has made, and continues to make, affirmative false statements and misrepresentations to consumers, and continues to omit the fact that the Products contain PFAS, to promote sales of its Products.

139.    Defendant has misrepresented, concealed, and otherwise omitted material facts that would have been important to Plaintiff and Class Members in deciding whether to purchase the Products. Defendant's misrepresentations and omissions were knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members. Accordingly, Plaintiff

and Class Members reasonably relied upon Defendant's misrepresentations and concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

140.    The PFAS chemicals in the design and/or manufacture of Defendant's Products were not reasonably detectible to Plaintiff and Class Members.

141.    At all times, Defendant actively and intentionally misrepresented the qualities and characteristics of the Products, while concealing the existence of the PFAS chemicals and failing to inform Plaintiff or Class Members of the existence of the PFAS chemicals in its Products. Accordingly, Plaintiff's and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

142.    Defendant's statements, words, and acts were made for the purpose of deceiving the public, and suppressing the truth that the Products contained artificial, man-made PFAS chemicals.

143.    Defendant misrepresented the Products and concealed the PFAS chemicals for the purpose of delaying Plaintiff and Class Members from filing a complaint on their causes of action.

144.    As a result of Defendant's intentional misrepresentations and active concealment of the PFAS chemicals and/or failure to inform Plaintiff and Class Members of the PFAS chemicals, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendant is estopped from relying on any statutes of limitations in light of its intentional misrepresentations and active concealment of the inclusion of artificial, man-made PFAS chemicals in the Products.

145.    Further, the causes of action alleged herein did not occur until Plaintiff and Class Members discovered that the Products contained PFAS chemicals. Plaintiff and Class Members had no realistic ability to discern that the Products contained PFAS chemicals until they learned

of the existence of the PFAS chemicals. In either event, Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence and true nature of the Products.

## FEDERAL RULE OF CIVIL POROCEDURE 9(b) ALLEGATIONS

146.    Although Defendant is in the best position to know what content it placed on its packaging, website(s), and other marketing and advertising during the relevant timeframe, and the knowledge that it had regarding the PFAS chemicals and its failure to disclose the existence of PFAS chemicals in the Products to Plaintiff and consumers, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

147.    **WHO**: Defendant made its Nutrition claims and other health and environmentally-focused representations on the Products' packaging, online, and its marketing and advertising of the Products.

148.    **WHAT**: Defendant's conduct here was, and continues to be, deceptive and fraudulent because of its Nutrition claims and other health and environmentally-focused representations . Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Products were manufactured and sold with the represented qualities. Defendant knew or should have known this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet it continued to pervasively market the Products as possessing qualities they do not have.

149.    **WHEN**: Defendant made material misrepresentations, false statements and/or material omissions during the putative Class periods and at the time Plaintiff and Class Members purchased the Products, prior to and at the time Plaintiff and Class Members made claims after realizing the Products contained artificial, man-made chemicals, and continuously throughout the applicable Class periods.

150.    **WHERE**: Defendant's marketing message was uniform and pervasive, carried through false statements, misrepresentations, and/or omissions on the Products' packaging, as well as on website(s) and social media channels used to market and advertise the Products.

151.    **HOW**: Defendant made false statements, misrepresentations and/or material omissions regarding the presence of PFAS chemicals in the Products.

152.    **WHY**: Defendant made the false statements, misrepresentations and/or material omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Products over other brands that did not make similar Nutrition Claims and other health and environment-focused representations, the effect of which was that Defendant profited by selling the Products to many thousands of consumers.

153.    **INJURY**: Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have, absent Defendant's misrepresentations, false and misleading statements.

## CLASS ACTION ALLEGATIONS

154.    Plaintiff brings this action individually and as the representative of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the below-defined Classes:

> **National Class**: During the fullest period allowed by law, all persons who purchased the Products within the United States for personal use and not for resale.

> **New York Subclass**: During the fullest period allowed by law, all persons who purchased the Products within the State of New York for personal use and not for resale.

155.    Members of the classes described are referred to herein as "Class Members" or members of the "Class."

156.    Plaintiff reserves the right to amend the Class definitions or add a Class or Classes if discovery and/or further investigation reveal that the Class definition(s) should be narrowed, expanded or otherwise modified.

157.    The following are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

158.    **Numerosity – Federal Rule of Civil Procedure 23(a)(a)**: While Plaintiff does not know at this time the exact number of proposed Class Members, given the nature of the claims and the volume of sales of the Products nationally, the members of the Class are so numerous that their individual joinder herein is impracticable.  Plaintiff is informed and believes that there are tens of thousands of members in the proposed Class, if not more, and a precise number can be ascertained through discovery. The number of individuals who comprise the Class are so numerous that the disposition of all such person's claims in a class action, rather than in individual actions, will benefit both the parties and the courts.

159.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**: Common questions of law and fact exist as to all members of each of the Class and

predominate over questions affecting only individual members of the Class. Such common

questions of law or fact include, but are not limited to, the following:

    a.    Whether Defendant misrepresented, omitted, and/or failed to disclose material facts concerning the Products;

    b.    Whether Defendant's conduct was unlawful; unfair; fraudulent and/or deceptive;

    c.    Whether Defendant breached express warranties to Plaintiff and Class Members;

    d.    Whether Defendant was unjustly enriched as a result of the unlawful conduct alleged herein such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the proposed Class;

    e.    Whether Plaintiff and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

160.    Defendant engaged in a common course of conduct giving rise to the legal rights

Plaintiff seeks to enforce on behalf of himself and the other Members of the proposed Class.

Similar or identical statutory and common law violations, business practices, and injuries are

involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the

numerous common questions that dominate this action.

161.    **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiff's claims are

typical of the claims of the other Members of the Class because, among other things, all Members

of the Class were comparably injured through Defendant's uniform misconduct described herein.

Further, there are no defenses available to Defendant that are unique to Plaintiff or to any

particular Members of the Class.

162.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**

Plaintiff is an adequate Class representative because his interests do not conflict with the interests

of the other Members of the Class he seeks to represent; he has retained counsel competent and

experienced in complex class action litigation; and he will prosecute this action vigorously. The

interests of the Class will be fairly and adequately protected by Plaintiff and the undersigned counsel.

163.    **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, Members of the Class would continue to suffer the harm described herein, for which they would have no remedy.  Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant.  The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

164.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Members of the Class to individually seek redress for Defendant's wrongful conduct.  Even if Members of the Class could afford individual litigation, the court system could not.  Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**Violation of the New York Deceptive Trade Practices Act,
New York Gen. Bus. Law § 349, *et seq.*
(Plaintiff on behalf of the New York Subclass)**

165.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

166.    The New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

167.    Defendant misleadingly, inaccurately, and deceptively advertises and markets their Products to consumers.

168.    Defendant's improper consumer-oriented conduct—including labeling and advertising the Products using the Nutrition Claims and other health and environmental-focused representations as described herein —is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass Members to purchase and pay a premium for Defendant's Products and to use the Products when they otherwise would not have. The Defendant has made the untrue and/or misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth.

169.    Defendant further engaged in deceptive conduct by selling misbranded and adulterated products in violation of the FDCA and NY Agriculture and Markets Law § 199-a.

170.    Plaintiff and the New York Subclass Members have been injured inasmuch as they paid a premium for Products that were—contrary to Defendant's representations— not free of artificial ingredients and did contain dangerous levels of the man-made chemical PFAS. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

171.    Defendant's advertising and Products' packaging and labeling induced Plaintiff and the New York Subclass Members to buy Defendant's Products and to pay a premium price.

172.    Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Subclass Members have been damaged thereby.

173.    As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and the New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

174.    Finally, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

<u>**COUNT II**</u>
**Violation of the New York Deceptive Trade Practice Act,**
**New York Gen. Bus. Law § 350, *et seq.***
**(Plaintiff on behalf of the New York Subclass)**

175.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

176.    The N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

177.    N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

178.    Defendant's labeling and advertisements contain untrue and materially misleading statements and omissions concerning Defendant's Products inasmuch as they misrepresent that the Products are a healthy, clean, and environmentally friendly sports drink that is good for consumers.

179.    Defendant further engaged in deceptive conduct by selling misbranded and adulterated products in violation of the FDCA and NY Agriculture and Markets Law § 199-a.

180.    Plaintiff and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Products which were—contrary to Defendant's representations—and did contain dangerous levels of PFAS. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

181.    Defendant's advertising, packaging, and Products' labeling induced Plaintiff and the New York Subclass Members to buy Defendant's Products.

182.    Defendant made the untrue and/or misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth.

183.    Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

184.    Defendant made the material misrepresentations described in this First Amended Complaint in Defendant's advertising and on the Products' packaging and labeling.

185.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

186.    As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory, compensatory,

treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

187.    Finally, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## <u>COUNT III</u>
### Violation of N.Y Agriculture and Markets Law § 199-a

188.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

189.    Section 199-a of the New York Agriculture and Markets Law ("N.Y. Agric. & Mkts. Law") prohibits persons and corporations from manufacturing or selling in this state "any article of food which is adulterated or misbranded within the meaning of this statute."

190.    Food shall be deemed to be misbranded…[i]f its labeling is false or misleading in any particular. N.Y. Agric. & Mkts. Law § 201(1).

191.    The Product is misbranded because its labeling is false and misleading insofar as it purports to be "Zero Sugar" and "Eco Friendly" and does not disclose the presence of PFAS.

192.    Therefore, Plaintiff has alleged that the Products are misbranded and is illegal to sell and their labels are, therefore, misleading.

193.    Plaintiff has also alleged the Products' labeling is false and misleading given they contain multiple representations, i.e., that the Products contain "Zero Sugar", are "Eco-Friendly", and are "good for you and the environment" that are false given the Products contain PFAS.

194.    "Food shall deemed to be adulterated: If it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this subdivision if the

quantity of such substance in such food does not ordinarily render it injurious to health". N.Y. Agric. & Mkts. Law § 200(1).

195.    Plaintiff has alleged that the Products contain a poisonous or deleterious substance, PFAS, which does in fact render it injurious to the health of Plaintiff and class members.

196.    Plaintiff's testing, in part, has revealed the Product contains PFOA in amounts more than 200 times the EPA's current recommended levels of exposure.

197.    Due to EPA guidance, almost no level of exposure to PFOA is sufficient to avoid substantial health risks, and the level in any product should be zero.

198.    Hence, the quantity of PFOA in the Products is an amount that would ordinarily render it injurious to health within the meaning of N.Y. Agric. & Mkts. Law § 200(1).

199.    Due to Defendant's conduct, Defendant has violated N.Y. Agric. & Mkts. Law § 199-a and Plaintiff has suffered damages. Plaintiff reserves the right to quantify the amount of damages suffered at trial.

## COUNT IV
### Negligence Per Se

200.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

201.    Violation of a statute constitutes per se negligence where it can be shown that plaintiff belongs to the class of legislatively intended beneficiaries and that a right of action would be clearly in furtherance of the legislative purpose.

202.    Defendants are liable for negligence per se due to their violations of the Food Drug and Cosmetics Act (21 U.S.C. §§ 342, 343), described herein.  The Product is "adulterated" because it contains PFAS which is undisputedly a deleterious substance.

203.     Pursuant to 21 U.S.C. § 342, food is considered "adulterated" if it "contains any poisonous or deleterious substance which may render it injurious to health."

204.     Pursuant to 21 U.S.C. § 343, food is deemed "misbranded" if its "labeling is false or misleading in any particular."   The Product is "misbranded" because (a) the Product is misbranded because its labeling is false and misleading insofar as it purports to be "Zero Sugar" and "Eco Friendly" and does not disclose the presence of PFAS; and (b) its labeling fails to identify the fact that it contains or is at risk of containing PFAS.

205.     In addition, should this Court determine that Plaintiff lacks a private right of action under Section 199-a of the New York Agriculture and Markets Law (N.Y. Agric. & Mkts. Law), Defendants' violations of that statute (*see* Count III, above) amount to negligence per se under New York law.

206.     Both the N.Y. Agric. & Mkts. Law and the FDCA are designed to protect consumers like Plaintiff from products, such as the Product, which are adulterated with dangerous substances and/or labeled in a deceptive manner.   Accordingly, Defendants violations of these statutes subject them to liability for negligence per se under New York law.

### COUNT V
### Unjust Enrichment
### (In the Alternative and on Behalf of the Class)

207.     Plaintiff repeats and re-alleges the allegations above as if set forth herein.

208.     At all relevant times, Defendant was responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Products and its packaging. At all relevant times, it was reasonably foreseeable by Defendant that the use of the Products in their intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiff and the Class as the ultimate users of the Products.

209.     At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Products posed to Plaintiff and Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

210.     Defendant as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Products, had a duty to warn Plaintiff and the Class of all dangers associated with consumption of the Products.

211.     At minimum, the duty arose for Defendant to warn consumers that use of the Products could result in injury and was unreasonably dangerous.

212.     Defendant has been unjustly enriched in retaining the revenues derived from the purchases of the Products by Plaintiff and the other members of the Class.  Retention of those monies under these circumstances is unjust and inequitable because Defendant's representations regarding the quality or value of the Products were misleading to consumers, which caused injuries to Plaintiff and the other members of the Class, because they would have not purchased the Products had they known the truth or would only have purchased the Products for a lower price.

213.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and the other members of the Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and the other members of the Class for its unjust enrichment, as ordered by the Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated members of the Class, prays for relief and judgment, including entry of an order, as follows:

(a) Declaring that this action is properly maintained as a class action, certifying the proposed Class, appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

(b) Directing that Defendant bear the costs of any notice sent to the Class;

(c) Ordering Defendant to pay restitution to Plaintiff and the Class;

(d) A jury trial and damages according to proof;

(e) Awarding actual damages to Plaintiff and the Class;

(f) Awarding Plaintiff and members of the Class statutory damages, as provided by the applicable state consumer protection statutes invoked above;

(g) Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class;

(h) Civil penalties, prejudgment interest and punitive damages as permitted by law; and

(i) Ordering such other and further relief as the Court deems just and proper.


## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial of the claims asserted in this Amended Class Action Complaint.


Dated: June 12, 2023                         Respectfully submitted,


                                             */s/ J. Hunter Bryson*
                                             J. Hunter Bryson (admitted *pro hac vice*)
                                             **MILBERG COLEMAN BRYSON**
                                             **PHILLIPS GROSSMAN, PLLC**
                                             405 E 50th Street
                                             New York, NY 10022
                                             Tel: (630) 796-0903
                                             hbryson@milberg.com

Jason P. Sultzer, Esq.
Daniel Markowitz, Esq.
**THE SULTZER LAW GROUP P.C.**
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

Nick Suciu III*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
nsuciu@milberg.com

Gary Klinger*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
221 West Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com

Erin Ruben (admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
eruben@milberg.com

* *Pro Hac Vice* application forthcoming

*Attorneys for Plaintiff and the Proposed
Class*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 12, 2023 the foregoing document was filed via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.


*/s/ J. Hunter Bryson*
J. Hunter Bryson